**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**McALLEN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | 7:18-CR-0962 |
| | § | |
| EUGENE SCOTT MACKIE | § | |

### GOVERNMENT'S BRIEF ON SENTENCING ISSUE

At the sentencing hearing for Defendant Eugene Scott Mackie ("Defendant Mackie") on August 19, 2021, the Court ordered the Government to submit briefing on the appropriate enhancement applicable to Defendant Mackie under the "Specific Offense Characteristics" section U.S.S.G. § 2B4.1(b)(1). Specifically, the Court questioned whether $3.7 Million paid by Medicare and Medicaid to a co-conspirator home health agency should be included in determining the applicable specific offense characteristics enhancement under U.S.S.G. § 2B4.1(b)(1).

Given the unique facts of this case, the gross payment of $3.7 Million paid by Medicare and Medicaid to the co-conspirator home health agency *should not* be the basis for determining the specific offense characteristics. Section 2B4.1(b)(1) provides that the specific offense characteristics be based on the "greater of the value of the bribe or the improper benefit to be conferred." As discussed below, the parties agree that the value of the bribe to Defendant Mackie was approximately $61,000. However, in this case there is not a reliable means of approximating the value of the "improper benefit conferred" to the home health agency. The Guidelines and Fifth Circuit case law make clear that the "improper benefit" is the *net* benefit to the home health agency (the value of legitimate home health services must be subtracted from the gross payment amount of $3.7 Million). Here, the *net* value cannot be approximated because

1

the value of legitimate services is unknown. Moreover, even if the gross payment amount could be used to approximate the benefit conferred, it is not a reliable approximation in this case because the investigation revealed that a significant, but unknown, number of home health authorizations purportedly signed by Defendant Mackie in exchange for kickbacks were forged without his knowledge or consent. As a result, it is unclear what amount of the total $3.7 Million was part of the kickback scheme, and what part constituted billings based on a separate scheme by the home health agency to submit claims based on forged physician authorizations. In such cases, where the value of the improper benefit cannot be reasonably approximated, the Guidelines direct that the specific offense characteristics be based on the amount of the bribe. As a result, the specific offense characteristics should be based on the bribe amount of $61,000, not the gross payments from Medicare and Medicaid to the home health agency.

## Background

On May 29, 2018, Defendant Mackie was charged by Criminal Information with one count of conspiring to violate the Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)) in violation of 18 U.S.C. § 371. Docket No. 1. The Criminal Information alleged a kickback arrangement between Defendant Mackie and the operators of home health and adult day care agencies. In short, Defendant Mackie was alleged to have signed off on home health authorizations in exchange for being given access to patients at adult day care facilities for whom he could order hearing aids that could be billed to Medicaid for a significant profit.

Defendant Mackie pled guilty to the sole count of the Criminal Information on September 7, 2018. At his re-arraignment, Defendant Mackie admitted to his role in the illegal kickback conspiracy.

Defendant Mackie's plea was entered pursuant to a Plea Agreement in which "Defendant agree[d] . . . that the loss to [Medicaid] was $171,204.60[.]" Docket No. 21. This "loss"

amount represented the gross value of the bribe to Mackie as part of the kickback conspiracy. Defendant Mackie further admitted that the gross payments from Medicaid for prescribed hearing aids resulted in a net profit of approximately $61,000. In other words, Defendant Mackie admitted to signing home health authorizations in exchange for approximately $61,000 in net profit in violation of the Anti-Kickback Statute.

Following Defendant Mackie's guilty plea, U.S. Probation prepared a Pre-Sentence Investigation Report ("PSR"). The Final PSR based Defendant Mackie's guideline calculation under U.S.S.G. § 2B4.1 on the "improper benefit" of $171,204.60 in claims paid by Medicaid to Defendant Mackie, resulting in a +10 for specific offense characteristics. *See* Final PSR ¶ 29. The Final PSR noted that Medicare and Medicaid paid over $3.7 Million to the co-conspirator home health agency in relation to claims listing Defendant Mackie as the Attending/Referring physician. *Id.* ¶ 20. But Probation did not include the $3.7 Million as part of the "improper benefit" for purposes of determining Defendant Mackie's offense level under 2B4.1(b)(1).

Defendant Mackie appeared for his sentencing hearing on August 19, 2021. At the outset of the hearing, the Court questioned why the Final PSR did not include the $3.7 Million paid by Medicare and Medicaid to the co-conspirator home health agency in determining the specific offense characteristics set forth in Paragraph 29. The Court ordered the Government to file a brief on the issue.

## Argument and Authorities

For a conspiracy to violate the Anti-Kickback Statute, the relevant provision of the Sentencing Guidelines is Section 2B4.1.[1] Under Section 2B4.1, the specific offense

---

[1] According to Appendix A, a conviction of 18 U.S.C. 371 is governed by Section 2X1.1. U.S.S.G. App A. Section 2X1.1, in turn, applies the base offense level "plus any adjustments" from the substantive offense. U.S.S.G. § 2X1.1(a). In this case, the substantive offense was the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b. According to Appendix A, Section 2B4.1 ("Commercial Bribery and Kickbacks") applies to violations of the Anti-Kickback Statute. U.S.S.G. App A. Thus, 2B4.1 governs the offense conduct for Defendant Mackie. *See also* U.S.S.G.

characteristics are based on the "greater of the value of the bribe or improper benefit to be conferred." U.S.S.G. § 2B4.1(b)(1) (emphasis added).

In this case, the process for calculating the "value of the bribe" is straightforward. The "bribe" to Defendant Mackie was the profit he received from his ability to gain access to Medicaid beneficiaries at adult day care facilities controlled by his co-conspirators, for whom Defendant Mackie could submit claims to Medicaid for prescribed hearing aids.[2] The parties agreed in the Plea Agreement that the *gross* value of the "bribe" was $171,204.60 – the total amount paid by Medicaid to Defendant Mackie for hearing aids prescribed for adult day care beneficiaries. However, Defendant Mackie did not pocket the *gross* payments from Medicaid; he incurred the cost of hearing aids that were actually delivered to Medicaid patients. Defendant Mackie contends, and the Government does not dispute, that the *net* value of the bribe – the amount of profit Defendant Mackie received after deducting the cost of the hearing aids delivered to Medicaid beneficiaries – was approximately $61,000. Therefore, for purposes of 2B4.1(b)(1), "value of the bribe" to Defendant Mackie was $61,000.

In contrast, determining the value of the improper benefit to be conferred in this case is significantly more problematic. According to the commentary, "[t]he 'value of the improper benefit to be conferred' refers to the value of the action to be taken or effected in return for the bribe." U.S.S.G. § 2B4.1, comment. (n.2). In this case, the "improper benefit to be conferred" in exchange for the bribe was the signature of Defendant Mackie on home health authorizations, which enabled the co-conspirator home health agency to submit claims to Medicare for home

---

§ 2B4.1, comment. (backg'd) (specifically referring to violations of the Anti-Kickback Statute that "involve the offer or acceptance of a payment to refer an individual for services or items paid for under a federal health care program").

2      The Anti-Kickback Statute specifically refers to bribes paid in cash or "in kind." 42 U.S.C § 1320a-7b(b). In this case, giving Defendant Mackie access to Medicaid beneficiaries under the control of his co-conspirators at adult day care facilities was an "in kind" bribe.

4

health services.

Initially, one might reasonably assume that the total gross payments of approximately $3.7 Million from Medicare constitute the "value of the improper benefit to be conferred" for purposes of Section 2B4.1(b)(1). However, the Guidelines and Fifth Circuit caselaw state that "value" is defined as the *net* profit to the home health agency, not the *gross* Medicare/Medicaid payout. "The value of 'the benefit received or to be received' means the *net value of such benefit*." U.S.S.G. § 2C1.1, comment. (n.3) (referenced in U.S.S.G. § 2B4.1, comment. (n.2)) (emphasis added); *see also United States v. Landers*, 68 F.3d 882, 884 (5th Cir. 1995) (holding that the cost of goods sold must be deducted from the total payment to arrive at a net value of the improper benefit); *United States v. Ricard*, 922 F.3d 639, 657-58 (5th Cir. 2019) (vacating sentence because the district court improperly based the guideline calculation on the gross Medicare payment without deducting direct costs of the provider to arrive at a net value). The commentary includes a hypothetical example in which a kickback is paid to secure a $150,000 contract, which resulted in a profit of $20,000. *Id.* In that example, the "value of the benefit" for purposes of determining the offense level was the net profit of $20,000, not the gross contractual payment of $150,000. *Id.*

The Government concedes that, in this particular case, the "net value" of the Medicare payments is unknown. In order to determine the net value of the home health authorizations signed by Defendant Mackie, the gross Medicare payment must be reduced by the cost of providing medically necessary home health services to qualified Medicare beneficiaries. *See Landers*, 68 F.3d at 884; *Ricard*, 922 F.3d at 658. The investigation in this case simply did not reveal evidence sufficient to approximate the value of legitimate home health services provided by the co-conspirator home health agency.

To complicate matters further, the investigation revealed that in many instances

5

Defendant Mackie's signature was forged on home health authorizations used to bill Medicare. Witnesses informed investigators that that physician signatures, including the signature of Defendant Mackie, were frequently forged by the owner and staff members of the home health agency. In other words, there were two separate schemes. In one scheme, the scheme to which Defendant Mackie pleaded guilty, the home health agency bribed Defendant Mackie to sign authorizations for which the home health agency submitted claims to Medicare. In a separate scheme, the home health agency forged Defendant Mackie's signature on authorizations which were also used to submit fraudulent claims to Medicare. There is not sufficient evidence in this case to discern what amount of the $3.7 Million payout was based on the kickback scheme, for which Defendant Mackie is accountable, and what amount derives from the separate forgery scheme. Thus, even if a net benefit could be approximated, it is not a reliable approximation of the value of the kickback scheme without excluding claims based on forged signatures.

In cases, such as this one, where the "value of the benefit conferred" cannot be determined, the Guidelines provide that the value of the bribe should be used as the basis for determining the specific offense characteristics. *See* U.S.S.G. § 2C1.1, comment. (backg'd).[3] Here, as discussed above, the value of the bribe is $61,000.[4]

### Conclusion

Given the unique facts of this case, the $3.7 Million total payments from Medicare and Medicaid is not a reliable approximation of the value of the net benefit conferred on the home health agency as a result of the kickback scheme with Defendant Mackie. As a result, the

---

[3] "In a case in which the value of the bribe exceeds the value of the benefit, or in which the value of the benefit cannot be determined, the value of the bribe is used because it is likely that the payer of such a bribe expected something in return that would be worth more than the value of the bribe."

[4] Section 2B4.1 refers to the table in Section 2B1.1, which provides for a 6-level increase for amounts greater than $40,000 and less than $95,000.

6

specific offense characteristics of Section 2B4.1(b)(1) should be based on the value of the bribe to Defendant Mackie of $61,000.

>Jennifer B. Lowery,
>Acting United States Attorney
>Southern District of Texas
>
>    /s/ *Andrew R. Swartz*
>Andrew R. Swartz
>Assistant United States Attorney
>1701 W. Highway 83, #600
>McAllen, Texas 78501

## CERTIFICATE OF CONFERENCE

I HEREBY CERTIFY that the instant brief ordered by the Court does not require conference with counsel for Defendant.

>*s/ Andrew R. Swartz*
>Andrew R. Swartz
>Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 3, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system and provided an electronic copy to counsel of record for Defendant Mackie.

>*s/ Andrew R. Swartz*
>Andrew R. Swartz
>Assistant United States Attorney